# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

CARLOS GONZALEZ,

                                        Plaintiff,          DECISION & ORDER

                          -vs-                              12-CV-6151-CJS

CARESTREAM HEALTH, INC.,

                                        Defendant.

---

## APPEARANCES

For Plaintiff:                Kimberly A. Glennon, Esq.
                              160 Linden Oaks Dr.
                              Rochester, NY 14625
                              (585) 267-7457

                              Richard N. Franco, Esq.
                              Christina Agola PLLC
                              1415 Monroe Av.
                              Brighton, NY 14618
                              (585) 262-3320

For Defendant:                Jeffrey J. Calabrese, Esq.
                              Andre Leon Lindsay, Esq.
                              Harter, Secrest & Emery LLP
                              1600 Bausch & Lomb Place
                              Rochester, NY 14604‑2711
                              (585) 231‑1280

## INTRODUCTION

**Siragusa, J.** Plaintiff Carlos Gonzalez ("Gonzalez") filed a complaint alleging violations under the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the Family Medical Leave Act ("FMLA"). Complaint, Mar. 24, 2012, ECF No. 1. Defendant Carestream Health, Inc. ("Carestream") moved to

dismiss the complaint, and the Court granted the motion. Decision and Order, Sept. 19, 2012, ECF No. 10. Gonzalez appealed, and the Second Circuit, reviewing the case *de novo*, vacated this Court's judgment and remanded the case. *Gonzalez v. Carestream Health, Inc.*, No. 12-4202-cv, 520 Fed. Appx. 8 (2d Cir. Apr. 2, 2013). Mediation was unsuccessful. Mediation Certification, Jun. 16, 2014, ECF No. 30. Following discovery, the case is now before the Court on Carestream's February 9, 2015, motion for summary judgment, ECF No. 36, on which the Court heard oral argument. For the reasons stated below, the application is granted.

## FACTUAL BACKGROUND

The Court takes the following facts from the parties' Local Rule 56 statements, noting any factual disputes below.

### Gonzalez' Employment with Carestream

Gonzalez was born in 1949 and is 65 years old. Ex. A ("Pl.'s Dep.") 10:6–9, Pl.'s App'x to L.R. 56 Statement of Material Facts, Mar. 24, 2015, ECF No. 41-1. Gonzalez commenced his Carestream employment on May 1, 2007. Pl.'s Dep. 17:6-8. Prior to Carestream, Gonzalez worked for Eastman Kodak Company ("Kodak"), from 1976 until April 30, 2007. Pl.'s Dep. 16:9-12. Gonzalez began working for Carestream as part of the sale of Kodak's Health Group business in 2007. Pl.'s Dep. 16:9-12. Gonzalez automatically became a Carestream employee upon the sale and has no recollection of ever receiving an "offer" from Carestream. Pl.'s Dep. 17:2–18:13.

***Commercialization Business Manager & the Carestream Commercialization Process***

At Carestream, Gonzalez' title was Commercialization Business Manager ("CBM"). Pl.'s Dep. 17:6-8. "The responsibility of a [CBM] is to drive the project from start to completion using the Carestream product commercialization process. And you're the leader of a core team that involves all the required disciplines, both technical and non-technical." Pl's Dep. 20:24–21:5. Gonzalez described the deadlines contained within a project as "gates." *Id.* 21:17. He was responsible for "[l]eading the project team, making sure [they] stay on schedule and in particular making sure that [they] get the project through all the gates and the Carestream commercialization process." Pl.'s Dep. 21:15–18. Gonzalez testified that, "A gate is a milestone at which the status of the project gets presented to the decision-makers. And then the decision-makers decide if the project should move forward to the next phase or not." Pl.'s Dep. 22:6–9.

Two individuals supervised Gonzalez: Mike Tylutki ("Tylutki") and John Kopcienski ("Kopcienski"). Tylutki was his first supervisor from when Gonzalez started at Carestream until approximately February of 2010, at which time Gonzalez "changed where he was located" and began reporting to Kopcienski. Pl.'s Dep. 24:6–25; Ex. H ("Kopcienski Dep.") 20:9, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-4.

Tylutki, in his deposition testimony, detailed that for each project, "there are … four gates between the project initiation and commercialization." Ex. I ("Tylutki Dep.") 31:11–14, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-4. He further explained that,

> [t]here are also two subsequent gates post-commercialization, 4 and 5, which relate to a double-check back on the performance of the produce that was commercialized and then a closing gate. So in total there's [sic] actually

3

five. But typically these folks [sic] only had responsibility for the first 0 through 3.

Tylutki Dep. 31:12–21. He described that gate 0 was the phase where Carestream determined whether it made sense to pursue the project and invest additional time and resources. *Id.* 32:6-10; Pl.'s Dep. 22:22–24.

Kopcienski also described the gates and testified at his deposition that "Gate 1 is the point at which the project team is committing to the set of capabilities for the product, the time frame and the budget. And also from the business point of view, the profitability and cost of that project, [to] execute and to maintain post-launch." Kopcienski Dep. 33:20–24; *see also* Pl.'s Dep. 23:4–8 ("Gate 1 is a gate at which the requirements both technical and non-technical are defined and I, as the commercialization manager, gives [sic] an estimate of commit for a schedule for gate 3.").

"Gate 2 is the point at which the design verification phase is complete and … ready to transfer the product to manufacturing … and conduct field trials." Kopcienski Dep. 34:10–13. Gonzalez described gate 2 as the point at which "[e]nough of the project has been developed and is working and has been tested by quality assurance, that we can actually go and test it in the field in something that's called trade trials." Pl.'s Dep. 23:10–16. Gate 3 is the point at which the business launches the product. Kopcienski Dep. 34:19; *see also* Pl.'s Dep. 22:12-14 ("at gate 3 the company can sell the product and collect revenue. So if gate 3 doesn't happen, the business doesn't sell the product.").

***Carestream's Employee Review Procedure***

Carestream adopted an Equal Employment Opportunity Policy in 2007 prohibiting discrimination on the basis of age or any other status protected by law. A portion of that policy reads as follows:

4

> In addition to sexual, racial, and ethnic harassment, Carestream Health recognizes that other forms of unlawful harassment exist. Such unlawful harassment may target persons because of their color, religion, sexual orientation, marital status, pregnancy, citizenship status, national origin, age, disability, veteran status, or other factors. Carestream Health will not tolerate such conduct.

Ex. Q ¶ 1.2.4, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5.

Pursuant to Carestream's employee performance review procedure, each employee is evaluated annually. Kopcienski Decl. ¶ 6, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-7. During the evaluation process, Carestream employees perform a self-assessment of their work, providing information regarding each project on which they worked during the year. *Id.* After reviewing an employee's self-assessment, the employee's direct supervisor and other managers conduct a review of the employee's job performance to determine whether the employee has met all applicable goals and requirements and to weigh the employee's performance against the performance of other employees in similar job classifications. Kopcienski Decl. ¶ 7.

At the end of the review process, each employee receives one of the following three Performance Ratings: (1) Outstanding Performance; (2) Successful Performance; or (3) Less than Successful Performance. *See* Kopcienski Decl. ¶ 8. "Generally, any employee who receives a Performance Rating of '(3) Less than Successful Performance' was deemed ineligible for a performance bonus and automatically placed on a Performance Improvement Plan ('PIP')." Kopcienski Decl. ¶ 9. The performance evaluations carry the title of "Goal Setting and Appraisal."

**Gonzalez' 2008 Goal Setting and Appraisal**

From May 2007 until approximately February 2010, Tylutki supervised Gonzalez. Pl.'s Dep. 24:13–18. Tylutki is 55 years old. Tylutki Dep. 6:10. Tylutki was unaware of Gonzalez' age, but testified that he believes they are similar in age. *Id.* 18:6–10. Gonzalez admits that this was Tylutki's testimony, but denies that Tylutki did not know Gonzalez' age.

During the relevant time period, Tylutki was the CR[1] Development Manager and served in this position until January 2010. Tylutki Dep. 7:8–17. Tylutki wrote Gonzalez' 2007, 2008 and 2009 performance appraisals. *Id.* 34:8–11; 39:7–11. Gonzalez received an overall performance rating of "(2) Successful Performance" on his 2008 Goal Setting and Appraisal. *See* Ex. J, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5.

With respect to the *Cardinal* project at Gate 3D,[2] Tylutki noted that Gonzalez, needed "to improve on risk analysis early in [sic] program to make sure we identify all risks and mitigate risks earlier thereby creating more predictable performance." Ex. J at 1. Also, with respect to "Drive commercialization improvements," for the *Crystal* project at Gate 0, Tylutki wrote: "Continued improvement is needed. Looking for [Gonzalez] to react more quickly to performance issues within the team and take necessary steps to avoid program losing ground." Ex. J at 3. In a narrative attached to Gonzalez' 2008 performance appraisal, Tylutki outlined specific areas of improvement that Gonzalez needed to accomplish in 2009:

---

[1] Tylutki was not asked about, and did not explain at his deposition, what "CR" means.
[2] In his deposition testimony about the gates, Tylutki did not mention any letter designations following a gate number, but this is the number and letter that appear in the performance appraisal.

6

> For 2009 [Gonzalez] needs to work with his commercialization teams on improving schedule performance. [Gonzalez] needs to help the commercialization team do a better job with risk assessment, contingency plans, and keeping focus on the critical items which will deliver the program. Additionally I would like [Gonzalez] to continue to work on knowing when detail is needed and when it is not. One of the detriments of being very detail oriented is at certain stages of the program this can result in wasted effort. Making sure early on in programs that the team has the big picture and understands where they are relative to the overall goal is important to keep them from getting lost in the details and heading down paths which will not create success or will result in delays.

Ex. J at CH0019. At his deposition, Tylutki was asked the following question about the 2008 performance review, and gave the following response:

> Q. Okay. Generally after reviewing this performance evaluation in 2008, did you have concerns with Mr. Gonzalez' employment—or performance?

> A. I was starting to point out concerns, yes, with respect to ability to drive schedule and projects. And in particular, kind of assessing risks and apprising management of really where the risks were so that if changes were necessary, they could be made at a management level.

Tylutki Dep. 40:11–19. Gonzalez denies that his supervisor's comments were the equivalent of pointing out of concerns. Pl.'s Dep. 47:7–10. Gonzalez viewed Tylutki's comments "as a statement that I need to do even better next time in those areas." *Id.*

### Gonzalez' 2009 Goal Setting and Appraisal

In or around March 2010, Gonzalez received his 2009 performance appraisal. Pl.'s Dep. 49:8–12; Compl. ¶ 21. As noted in the appraisal, Gonzalez continued as CBM for the *Cardinal* project with responsibility for post-launch activities, and became the CBM for the *Crystal* and the *RadSuite v1.0* projects. Ex. K, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5.

As to the *Cardinal* project, Tylutki noted that, "Goal 3 not met. Post release assessment completed in Q4 vs Q2 plan." Ex. K at 1. He also noted, "[t]here was no direct

impact to business due to delay." *Id.* The *Cardinal* project had delays, as Gonzalez testi-

fied at his deposition: "Number 1, I was not able to get field performance data from

the—on the product. And at the same time I was also immersed in a brand-new project

that I gave priority to." Pl.'s Dep. 51:9–12. Gonzalez contends that while he cited to the

inability to obtain field performance data on the project as a reason for delay, he did not

state that delay was due to any action on his part. On the delay issue, he was asked the

following questions and gave the following answers:

> A. Well, the delay was significant. We were all frustrated by it.
>
> Q. Do you think there is anything that you could have done differently to avoid or make the delay—to avoid the delay to begin with?
>
> A. Actually I do not believe that.
>
> Q. Do you think there was anything you could have done differently to de-crease the delay?
>
> A. To decrease it, no. No. I do not believe that. Actually I think things im-proved. And if I also may add, that the technical project manager for that project also reported to Mr. Tylutki. And Mr. Tylutki has engineering exper-tise in that field too. Obviously, discussing it with the technical project manager and Mr. Tylutki while it was going on, none of us came up with any brilliant idea that would have accelerated that project any further.

Pl.'s Dep. 55:2–19. Notwithstanding the delays, Tylutki observed in the performance

appraisal that Gonzalez "has done a good job managing post gate activities and manu-

facturing yield has continued to exceed expectations." Ex. K at 1.

The 2009 performance appraisal also assessed Gonzalez' performance on the

*Crystal* project to which Tylutki assigned him. Gonzalez testified that Tylutki assigned him

to *Crystal* because "he hadn't been happy with the progress the team was making under

the previous leadership. And there was the hope that I could install [sic] some more

sticking to schedule type of discipline." Pl.'s Dep. 52:9–16. The *Crystal* project did not

pass Gate 1 until October 14, 2009, seven months later than the original commitment

date of March 31, 2009. *Id.* 54:8–23. Gonzalez denies that October 14, 2009, was seven months later than the original commit date. Gonzalez testified that he "disagreed with [Tylutki's] comment that gate 1 passed [sic] October 14th was a revised commit of July 30th. At a mid-phase review in June, we conveyed to management that the new prediction of the gate 1 was going to be in October." Pl.'s Dep. 53:7–11. Tylutki removed Gonzalez from responsibilities for the *Crystal* project "to increase his schedule predictability on *Radsuite* [sic]." Ex. K at 3.

With respect to the *RadSuite v1.0* project, Tylutki wrote in Gonzalez' review concerning Gate 0 for that project: "It is important that [Gonzalez] hit the Gate 0 date of April 16th. This program will be a potential gap closure project for Q4 so delivery in Q4 is a critical stretch. Gate 0 in April is a key milestone to meeting this goal." Ex. K at 4–5. However, the project did not pass Gate 0 until June 18, 2009, two months later than the original deadline. Ex. K at 4 ("Goal not met. Gate 0 passes 6/18/09 vs commit date of 4/16/09.").

Gonzalez denies that he was responsible for the delay at Gate 0 because, he testified: "At gate 0 the primary deliverables are of a business nature, a business case, for example, a very high-level description of the customer requirements. Those are primarily the responsibility of the product line manager." Pl.'s Dep. 58:3–7. At Gate 0, Gonzalez' responsibility was to draft a schedule and a commitment to a date for Gate 1. *Id.* 58:8–10. Gonzalez accomplished those responsibilities by the April 16th date. *Id.* 58:10–1. Management conducted a gate review on April 16, 2009, but had additional questions about the business strategy that required answers from the product line manager. *Id.* 58:11–24.

9

The *RadSuite v1.0* Gate 2 commitment date was originally January 14, 2010. Ex. K at 6. However, the project did not pass Gate 2 until January 28, 2010, two weeks later than the original commitment date. Ex. K at 6; Pl.'s Dep. 62:10–15. When questioned about the delay, Gonzalez testified in response to the following questions:

> Q. Can you explain why there was a two-week delay?
>
> A. There is [sic] multiple explanations. Product commercialization is hard. And sometimes the Crystal Ball was not that accurate. In my case, I pointed out to [Tylutki] and I was out for four weeks on medical leave during that -- during the phase, that project phase. There was somebody named to act in my place while I was gone.
>
> When I came back after my leave, I discovered that we were already a couple weeks behind where we should be. And I was not—I was not able to lead the team to make—to regain back those two weeks so we could finish on time.
>
> Q. Okay. And who was responsible for developing the original commit date January 14, 2010?
>
> A. I was.
>
> Q. And what exactly contributed to the delay?
>
> A. All I remember was that there—we had a schedule, a detailed schedule laid out in and when I came back to work and we reviewed where we were, we were behind. But I do not recall specifics, which work or which deliverables were the ones that were late.

Pl.'s Dep. 62:16–63:16.

For his 2009 performance appraisal, Tylutki gave Gonzalez an overall performance rating of "(3) Less than Successful Performance." Ex. K at 7. On or about March 13, 2010, Gonzalez submitted a written rebuttal to the review in which he addressed the delays associated with the *RadSuite* and *Crystal* projects, among other things. Ex. L, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5. With regard to delays in the *Cardinal* project, Gonzalez wrote:

> [Tylutki's] comment for Cardinal (GP-2 Screen for PoC CR) Post-Launch was only that the post-release assessment was late, while agreeing this caused no impact to business. My appraisal, however, didn't acknowledge that Cardinal contributed to the excellent DCS business results by delivering $3M in productivity, over 40% of the total CR productivity, in 2009. Knowing that field performance of the screens was robust, I prioritized Crystal and RadSuite over this assessment, which I think was the right decision.

Ex. L at 1.

Tylutki testified that in about June of 2009, Gonzalez advised him that he would be going out on medical leave. Tylutki Dep. 53:14–22. Gonzalez was out of work on short-term disability leave from September 21, 2009, until October 16, 2009 (25 days). Compl. ¶ 14. While Gonzalez was out on leave, his work was temporarily transitioned to another employee, Chuck Whitfield ("Whitfield"), who served as Acting CBM in Gonzalez' absence. Pl.'s Dep. 129:2–13; Kopcienski Dep. 30:24–31:3. Tylutki sought assistance to locate an individual to fill in for Gonzalez and took a recommendation from the software development team and selected Whitfield, who was, at the time, a project manager for Carestream, typically assigned to the Information Technology group. Tylutki Dep. 57:2–19, Ex. C, Pl.'s App'x to L.R. 56 Statement of Material Facts, Mar. 24, 2015, ECF No. 41-2.

Upon his return to work from medical leave in October 2009, Gonzalez was immediately returned to his CBM position, without any change to his salary or benefits. Pl.'s Dep. 128:18–23. Whitfield worked with Gonzalez for a short time period after his return. Pl.'s Dep. 130:16–21. Gonzalez testified that "Mr. Holmes expressed the desire to have the person who acted for me while I was gone to also remain in kind of like a co-leadership role." Pl.'s Dep. 129:4–7. Jim Holmes ("Holmes") was Kopcienski's supervisor. *Id.* 108:18–19.

***Performance Improvement Plan***

In early 2010, "there was a change in the engineering management structure. And [Gonzalez] then was transferred out of where he was into the software group." Kopcienski Dep. 20:2–5. As a result, Kopcienski, age 51, Manager of Software Program Managers, became Gonzalez' supervisor. Kopcienski Dep. 19:14–22; 20:2–5; Pl.'s Dep. 24:19–23. Kopcienski testified at his deposition that he was unaware of Gonzalez' age, but thought Gonzalez was a few years older than him. Kopcienski Dep. 21:4–15.

Pursuant to Carestream's Performance Improvement Plan ("PIP") Guidelines, an employee is placed on a PIP as a result of: (a) unsatisfactory performance of assigned job duties, (b) a less than successful rating on the annual Goal Setting and Appraisal process, and/or (c) other actions directly related to work performance. Ex. R at 1, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5. In April of 2010, Gonzalez was automatically placed on a PIP as a direct result of his 2009 performance appraisal. Kopcienski Dep. 47:3–15; 48:2–3.

Although Kopcienski did not supervise Gonzalez in 2009, and Tylutki wrote the 2009 performance review that resulted in Gonzalez' placement on a PIP, as Gonzalez' new supervisor, Kopcienski was responsible for drafting Gonzalez' PIP. Kopcienski Dep. 48:8–21. Kopcienski reviewed the plan he drafted with his supervisor, Holmes, and with Human Resources Director Larry O'Meal ("O'Meal"). Kopcienski Dep. 54:2–10. Kopcienski based his April 12, 2010, PIP's "Description of issue" in areas 1 through 4 on Gonzalez' "performance in core team and prior gate reviews and then general expectations for the position." Kopcienski Dep. 49:8–12; *see also* Pl.'s Dep. 88:19-22 ("the PIP, by its name, is a performance improvement plan, so it's looking forward."); Ex. M ("PIP"),

Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5.

Carestream's PIP Guidelines also state that "[t]he plan stresses time-bound re-sults and lasting behavioral changes to improve overall performance. It focuses on results by requiring employees to meet the expectations of the Company, division and job." *Id.* In the "Range of Outcomes" section of the PIP Guidelines, it states in part that, if there is deterioration, no improvement or insufficient improvement in performance, a recom-mendation for termination of employment is appropriate. Ex. R at 2.

On or about April 15, 2010, Kopcienski met with Gonzalez to review the PIP. Kopcienski Dep. 58:18–22; Pl.'s Dep. 83:14–22. The PIP outlined certain performance deficiencies personally observed by Kopcienski and other members of management, and set forth several concrete goals for Gonzalez to complete within specific deadlines. *See* Ex. M, p. 1; Kopcienski Dep. 54:18-23; 56:6-10; 57: 3-4. In particular, the PIP set forth the following four areas for improvement:

> Area 1 - Behavior Effective Communication - up & down the organization. [Gonzalez] does not ensure that communication to the different team members (Core team and Management) is clear and at the appropriate level for the receiver. This is particularly critical for communications with Management (Gate reviews and program reviews). Ensure that Issues are identified clearly with potential business impact defined and supporting data is available. Eliminate the "noise" in communication.

> Area 2 - Behavior: Driving the team not letting team drive you. [Gonzalez] does not drive the team quickly to decisions and as necessary make deci-sions and outline a plan to meet the objectives then drive the team to meet the necessary goals.

> Area 3 - Behavior: Effective Project Management - focusing on Critical is-sues. [Gonzalez] does not ensure that he focus's [sic] his effort on the factors that are critical for success of the program and defer [sic] actions or activities for himself and the team that are not required to meet the program goals. As stated below this needs to be clearly communicated so that the team has a clear understanding of expectations.

> Area 4 - Behavior: Lead as a Software Program Manager. [Gonzalez'] role on ImageSuite is as CBM, in this role on a software program, [Gonzalez] has not demonstrated sufficient software system understanding to provide guidance and recommendations to the team regarding solutions. Some examples of this are[:] System and software security, and handling the distribution of scanner firmware.

Ex. M at 1. The PIP specifically noted, "if your performance does not improve or is not sustained, you may receive additional disciplinary action up to and including termination." Ex. M at 3. Gonzalez concedes this language is contained in the PIP, but disputes that to the extent the language characterizes his performance, that it does so accurately. *See, generally*, Pl.'s Dep. 86–91.

On or about May 5, 2010, Gonzalez met with Kopcienski to discuss his progress on the PIP and was given an updated PIP that contained Kopcienski's "Progress Comments" dated May 5, 2010. Ex. N at 3;[3] Pl.'s Dep. 97:7–20; 99:3–5. In his Progress Comments, Kopcienski noted that with regard to the *RadSuite* project (referred to as *ImageSuite* in the PIP), Gonzalez continued to display performance deficiencies, particularly with "effectively managing and driving projects and the review and presentation of those to management." Kopcienski Dep. 63:12–16; Ex. N at 3. Kopcienski wrote in the revised PIP that, "[Gonzalez'] unwillingness to view the product as a system (including hardware) prevented him from adequately presenting the business risks with regard to the service business case." Ex. N at 3. Kopcienski further articulated that, "[Gonzalez] needs to clearly state the conclusion based on the data and present this strongly and in a clear manner, not discuss around the point and provide opinion[.]" *Id.* Kopcienski also observed that during the Gate 3 review on the project that "the discussions began to focus on out of

---

[3] Exhibit N's pages are not numbered, but the May 5, 2010, comments are on the third page of the exhibit, which is labeled by the Court's CM/ECF system as page 26 of 51.

scope features and enhancements" and that Gonzalez "did not take decisive action to regain control and indicate that the gate was for the set of features as has been delivered and outlined in the CRD."[4] *Id.* Gonzalez disputes his supervisor's characterizations. *See* Pl.'s Dep. 98:8–101:25.

Kopcienski added Progress Comments to the PIP between June 4 and June 15, 2010, which were reflected in a final version of the PIP, dated June 30, 2010. Ex. P, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5. On or about June 25, 2010, Gonzalez submitted his written response to the PIP. Ex. O, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5. Kopcienski's additional Progress Comments included feedback from other members of the management team, specifically Holmes and Ted Taccardi, Chief Operating Officer of the XRS Division ("Taccardi"). Ex. P at 3–4. Both Holmes and Taccardi had an opportunity to observe Gonzalez' performance during gate review meetings. Pl.'s Dep. 108:9–25; 109:2–15. At a pre-gate review meeting on May 27, 2010, Holmes observed that:

> Pre-review was not [a] clear presentation of the critical material facts associated with the commercial release of the product.
>
> Significant elements of the commercialization expectations were NOT met and will have to be delivered after the gate.
>
> There was not a clear message of why this should be delivering against commitments—excuse that it didn't matter to the business is not acceptable. Our commitment to deliver is our commitment. If there were extenuating circumstances (outside of the project control that couldn't be risk managed by the project), then perhaps there is an excuse—there does not appear to be any of these.
>
> Communication/presentation was not clear and succinct. There was information presented, but the requirement is for key messages to be delivered from the information.

---

[4] CRD evidently refers to "customer requirements document." *See* Pl.'s Dep. 60:4–5.

Ex. P at 3–4. Gonzalez disputes the accuracy of Holmes' statements. Pl.'s Dep. 112:4–7.

Regarding the same May 27th pre-gate review meeting, Taccardi observed that:

> I do not think that [Gonzalez] managed the pre-gate review meeting well. The meeting objectives were not clear. It appeared that the assumption was that everything was on plan/target and we should pass the gate.... Yet the materials we were reviewing did not demonstrate that.
>
> Items that were not on plan (translations of plan or incremental test defects discovered were not clearly described).
>
> It felt like we were having a pre-gate review just to have it ... vs. a focused review on what changed from plan and actions to mitigate[,] leading to a well thought out recommendation.

Ex. P at 4. Gonzalez disputes Taccardi's comments as inaccurate. Pl.'s Dep. 112:19–22.

The PIP identified additional areas of performance deficiencies in the June 4 and June 15, 2010, Progress Comments. Ex. P at 4. For example, with respect to the CPE and MR1 Planning,[5] the June 4th commitment states, among other things, that "[Gonzalez] has failed to define and describe the planning and 12 criteria for CPE work associated with MR1 within the timelines required by item 3.… [Gonzalez] needed to personally review and provide a strong recommendation regarding existing, internal, defects should [sic] be considered for conclusion in MR1." Ex. P at 4. Additionally, with respect to Core Team Leadership, the June 4th comment states, among other things, that "[Gonzalez'] management/running of the core team is often the team leading the meeting.… The core team leadership is one of the reasons for lack of progress on MR1 strategy and V2[6] planning getting started after Gate 3." Ex. P at 4. Gonzalez' progress on the PIP was summarized in the "Path Forward" as follows:

---

[5]   Neither of these two abbreviations (CPE and MR1) is defined by the parties.
[6]   Evidently a reference to "version two." *See* Pl.'s Dep. 115:18–22 ("so when we pass gate 3, we ship version 1.0. This PIP is talking about MR1, MR2 and V2. So version 2 was going to be the third software release after the one that I completed.").

You have been able to address a small percentage of your performance improvement plan goals. However there are still several areas as high-lighted above that are not meeting expectation, basically showing the level of improvement expected at this time and at your level of position. Based on this reality, the decision has been made to terminate your employment from Carestream Health effective June 30, 2010.

Ex. P at 5.

On June 30, 2010, during a meeting with Kopcienski and Holmes, Gonzalez was presented with a copy of the June 30th PIP. Kopcienski Dep. 81:20–25; Pl.'s Dep. 107:14–25. Kopcienski had conferred with his supervisor, Holmes, and H.R Director O'Meal, regarding the decision to terminate his employment due to his continued defi-ciencies and, specifically, his failure to meet the objectives set forth in the PIP. Kopcienski Dep. 73:23–24; 74:13-17. During the meeting, Kopcienski advised Gonzalez that his employment was being terminated effectively immediately. Kopcienski Dep. 82:4–7; Pl.'s Dep. 107:14–25.

### Gonzalez' Allegations of Age Discrimination and FMLA Retaliation

Gonzalez conceded during his deposition that no one at Carestream ever made any derogatory remarks regarding his age, or his medical leave. Pl.'s Dep. 162:5–7; 157:17–19. However, Gonzalez testified to numerous examples of criticisms made of his performance which he attributed to his medical leave.

On or around February 4, 2010, approximately two weeks after he returned from medical leave, Gonzalez had a telephone conversation with Tylutki in which Tylutki stated that Holmes was concerned about items not completed while Gonzalez was out on leave. Pl.'s Dep. 34:21–25, 66:15–69:22, 773:–17, 1324–7. In an email to Tylutki dated October 29, 2009, at 10:17 AM, Gonzalez wrote the following:

17

> To follow up on yesterday's conversation, where you said you'd heard a concern about my not tracking the key SW milestones for RadSuite Gate 2.
>
> I left on my medical leave the day after Gate 1. Below is the note I sent my last day to Chuck as the acting CBM of items that needed attention. Meeting the SW milestones is on the list (Item 7).
>
> I was out sick for a month, and have been back to work about 2 weeks. I'm now following up to verify the milestones (as well as all other aspects of our project schedule) have been done. I think to criticize me because team has not met the milestones is off-base.
>
> On a separate subject, since I've been back I've been working to resolve schedule slips to items 3, 4, 5 in the list.

Ex. I at 1, Pl.'s App'x to L.R. 56 Statement of Material Facts, Mar. 24, 2015, ECF No. 41-3. In this exhibit, below the email to Tylutki, is a copy of an email from Gonzalez to Whitfield, his replacement during the time he was on sick leave, dated September 18, 2009, at 10:54 AM, which states in relevant part as follows: "Chuck, here are the key items that need focus the next four weeks: … DCS SW milestones met," followed by a chart listing four milestones. *Id.* Gonzalez' 2009 performance appraisal, in the "Self Assessment" portion, references his medical leave. Pl.'s Ex. E at 2, Goal Setting and Appraisal, Jan 1, 2009 to Dec. 31, 2009, ECF No. 41-2. The first reference is under "Self Assessment" for item "(5) Receive regulatory approvals for test 7 countries (June)," and states: "9/23. That was during my medical absence, so still need to determine if a meeting to review is required." *Id.* The second reference is again under the self assessment column, for "1.7 *RadSuite v. 1.0 Gate 2*" and reads as follows: "10/30/09: My medical leave started right after Gate I. In the 2 weeks since my return, I worked with team to resolve/mitigate a number of schedule slips in key areas, to keep team on track to deliver the commitment." *Id.* In the same row are these comments under the column "Supervisor Assessment": "Q3 Results: Carlos was not able to work on this deliverable during Q3 due to his medical

leave. Carlos did a nice job transitioning to temporary CBM within only a few days due to delays in finding a replacement." *Id.*

Carestream contends that Gonzalez admitted he has no evidence that criticisms of his performance were based on his age. Pl.'s Dep. 142:17–21. However, Gonzalez responds that his actual testimony was this: "All that I'm aware of is the criticism that I received that I felt was unjustified. And also criticism that grew significantly after my return to work." Pl.'s Dep. 159:20–23. Gonzalez' relevant testimony was as follows:

> Q. Do you believe or contend that your supervisor blamed you for the time frames not being met because of your age?
>
> A. I believe that.
>
> Q. What's the factual basis for that?
>
> A. I have no factual basis other than, you know, observation and intuition.
>
> Q. Do you believe or contend that your supervisors blamed you for the time frames not being met because of your medical leave?
>
> A. I believe so. But again, I was not at the meetings that they had, listening in to what they were saying. I cannot read their minds. So I don't know that for a fact.
>
> Q. You have no basis for that belief; is that what you're saying? …
>
> Q. Or can you provide me with a basis for your belief?
>
> A. I do not have evidence to provide you.

Pl.'s Dep. 145:9–146:4. Although Carestream asserts that Gonzalez never complained to any Carestream supervisor or human resources personnel about begin treated differently because of his age or because he took medical leave, Gonzalez responds that on February 4, 2010, he sent an email to his supervisor, Tylutki, with a copy to Taccardi and then-H.R. Director O'Meal, expressing his concern that he was being held responsible for items not completed while he was out on medical leave. Ex. K at 1, Pl.'s App'x to L.R. 56 Statement of Material Facts, Mar. 24, 2015, ECF No. 41-3. In that email, Gonzalez wrote:

> Finally, if you recall right after I came back from my medical leave you ex-
> pressed a concern that I had not focused on the DCS software process
> milestones. I explained (and showed you evidence that) I had asked the
> interim CMB to follow up on them. I don't know what else I could have done.

Ex. K at 1. In his March 13, 2010, rebuttal statement, Gonzalez stated, "I was most

concerned by unfair criticism about problems that occurred while I was out for surgery...."

Ex. L at 2.

## STANDARDS OF LAW

### Summary Judgment

Summary judgment may not be granted unless "the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, …

demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law,"

Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will

bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to

an absence of evidence to support an essential element of the nonmoving party's claim."

*Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non‑moving party to demonstrate specific facts

showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250 (1986). To do this, the non‑moving party must present evidence sufficient to

support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit

crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v.

N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appro-

priate only where, "after drawing all reasonable inferences in favor of the party against

whom summary judgment is sought, no reasonable trier of fact could find in favor of the

non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Of course, it is well settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotations omitted).

### Age Discrimination in Employment Act

A cause of action here is brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, *et seq.* ("ADEA"). The ADEA provides in pertinent part as follows:

(a) Employer practices. It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...

29 U.S.C.S. § 623(a)(1) (2012). To plead a claim under the ADEA, a plaintiff must show that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997), *cert denied,* 525 U.S. 936 (1998). Unlike Title VII cases, where the Court can consider a mixed motive for a plaintiff's claim of discrimination, under

the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's ad-

verse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

### New York Human Rights Law

The New York Human Rights law states in pertinent part as follows:

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1) (2007). The Court notes that both State and Federal courts have

determined that,

the elements of an age discrimination claim under the New York State Human Rights Law and the ADEA are essentially the same and courts apply the same standards for analyzing age discrimination claims under both statutes (*see Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913; *Ferrante v. American Lung Assn.*, 90 N.Y.2d 623, 665 N.Y.S.2d 25, 687 N.E.2d 1308; *Hardy v. General Elec. Co.*, 270 A.D.2d 700, 701, 705 N.Y.S.2d 97).

*Brannigan v. Board of Educ. of Levittown Union Free School Dist.*, 18 A.D.3d 787, 789,

796 N.Y.S.2d 690, 692 (N.Y.A.D. 2d Dept. 2005).

### McDonnell Douglas Burden Shifting Analysis

Claims under the ADEA and New York Human Rights Law are analyzed in accord

with the burden-shifting framework established by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973), and partly revised by its decision in

*Gross v. FBL Financial Services*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119

(2009). In 2010, the Second Circuit described the analytical framework as follows:

Prior to *Gross*, claims under the ADEA were analyzed under the bur-den-shifting framework set forth by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), pursuant to which the plaintiff had the burden of demonstrating that his or her age was a motivating factor in the adverse employment action…. Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination. *Holcomb*, 521 F.3d at 138. Significantly, in this respect, before *Gross*, the employee could prevail if the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find "that her dismissal was motivated *at least in part* by age discrimination." *Tomassi*, 478 F.3d at 114 (emphasis added).

*Gross* changes the latter part of this formulation by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases…. *Gross* makes clear that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action" and not just a contributing or motivating factor. *Gross*, 129 S. Ct. at 2352. *Gross* did not, however, reject the *McDonnell Douglas* burden-shifting framework for ADEA cases altogether. Instead, it left that issue open, noting only that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context." *Id.* at 2349 n.2. Its decision explicitly focused on "the textual differences between Title VII and the ADEA that prevent … applying *Price Waterhouse* and *Desert Palace* [mixed-motive analysis] to federal age discrimination claims." *Id.*

Accordingly, we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit. *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (applying the *McDonnell Douglas* framework in an ADEA case); *see also United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("[W]e . . . are bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court.").

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105–06 (2d Cir. 2010) (footnote and some citations omitted). The required showing for a prima facie case is *de minimis*. *Hunt v. Tektronix, Inc.*, 952 F. Supp. 998, 1003 (W.D.N.Y. 1997).

In a footnote, the Second Circuit stated that "[t]he law governing ADEA claims has been held to be identical to that governing claims made under the NYHRL. *See Sutera v. Schering Corp.*, 73 F.3d 13, 16 n.2 (2d Cir. 1995). Accordingly, we assume, without deciding, that the Supreme Court's *Gross* decision affects the scope of the NYHRL law as well as the ADEA." *Id.*, 596 F.3d at 105 n.6.

### Family Medical Leave Act

The Southern District Court in *Smith v. Westchester County*, 769 F. Supp. 2d 448 (2011), discussed the elements of a retaliation claim under the Family Medical Leave Act ("FMLA"):

> In an FMLA retaliation claim, "an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Krosmico*, 2006 WL 3050869, at *2. To state a claim for retaliation under the FMLA, Gonzalez must allege that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. The Second Circuit has held that at the summary judgment stage, FMLA retaliation claims should be analyzed under the burden‑shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Potenza*, 365 F.3d at 167–68.

*Smith*, 769 F. Supp. 2d at 469–70; *see also, Milne v. Navigant Consulting*, No. 08 Civ. 8964 (NRB), 2010 U.S. Dist. LEXIS 115650 (S.D.N.Y. Oct. 27, 2010); *Brown v. The Pension Boards*, 488 F. Supp 2d. 395 (S.D.N.Y. 2007). Regulations promulgated under FMLA require that "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302 (c); *see Mullin v. Rochester Manpower*, 192 F. Supp. 2d 80 (W.D.N.Y. 2002).

Ever since the Supreme Court's decision *Univ. of Texas SW. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522–23, 186 L. Ed. 2d 503 (2013) ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act."), courts have questioned whether the more rigorous "but for" causation standard should apply to FMLA retaliation claims. *See, e.g., Brown v. Northrop Grumman Corp.*, No. 12-CV-1488 JS GRB, 2014 WL 4175795, at *16 (E.D.N.Y. Aug. 19, 2014) ("since *Nassar,* courts within and without this Circuit have questioned whether the 'but-for' causation standard should now apply to FMLA retaliation claims, with varying results."). For the purposes of the pending motion, this Court will apply the less rigorous standard of "motivating factor" to the FMLA retaliation claim.

## ANALYSIS

Carestream argues in its memorandum of law that it is entitled to summary judgment on all causes of action. Specifically, Carestream states:

> The record before the Court shows that Plaintiff was not qualified for the Commercialization Business Manager ("CBM") position he held at the time of his termination, and even if he was, there is no evidence that his termination occurred under circumstances giving rise to an inference of discrimination. Second, as explained fully below, Carestream had legitimate, non-discriminatory reasons for terminating Plaintiff's employment. The record shows that Plaintiff received poor performance reviews from two supervisors at different time periods during his Carestream employment. Plaintiff was also placed on a Performance Improvement Plan ("PIP") in April 2010, giving him an opportunity to improve his performance. Plaintiff failed to improve his performance, despite the counseling he received, and was ultimately terminated on June 30, 2010.… Plaintiff cannot establish a *prima facie* case of age discrimination or that his age was the "but-for" cause of his termination.

Def.'s Mem. of Law 1, Feb. 9, 2015, ECF No. 36-8. Carestream also contends that Gonzalez has failed to show he applied for FMLA leave, or that he suffered any adverse

consequences when he returned from leave. Carestream argues that it has articulated legitimate, non-discriminatory reasons for terminating Gonzalez, and that Gonzalez has not brought forth any evidence that Carestream's reasons were a pretext for retaliation. *Id.* 2. After exhaustively reviewing the evidence presented on this motion, the Court determines that Gonzalez has not raised a material question of fact precluding summary judgment, and that Gonzalez has failed to show an invidious discriminatory purpose on the part of Carestream.

### ADEA Claim

Carestream focuses on the second element of an ADEA claim:

> [a plaintiff] need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him.

*Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155. (2d. Cir. 1978). Here, Carestream contends that the evidentiary proof in admissible form shows that Gonzalez did not meet the minimum performance standards to merit continued employment. Therefore, it argues that Gonzalez has failed to make a prima facie case of age discrimination.

The Second Circuit's decision in *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001), *as amended* (June 6, 2001), makes short work of Carestream's argument. In its decision, the Second Circuit stated, in pertinent part, the following:

> The qualification prong must not, however, be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision. As we have repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he "possesses the basic skills necessary for performance of [the] job." *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir.1991) (internal quotation marks omitted).

26

> As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw. *See Gregory v. Daly,* 243 F.3d 687, 695–96 (2d Cir.2001).

*Slattery*, 248 F.3d at 92. Gonzalez was qualified for the CBM position he occupied.

Having determined that Gonzalez has met three out of four elements of a prima facie case, the Court now moves to his assertion that his termination occurred under circumstances giving rise to an inference of age discrimination.[7] Gonzalez' deposition testimony, which one would assume to be his strongest proof of a nexus between his termination and his age, fails to show that. The following questions and Gonzalez' answers relate to his age discrimination claim:

> Q. And did you ever complain to anyone in human resources about your belief that you were being treated unfairly because of your age?
>
> A. Because of my age, no. (Pl.'s Dep. 141:11–14)
>
> Q. Did you ever complain to anyone about the October 29, 2009 conversation that you had with your supervisor? Did you ever complain to anyone about that particular conversation in which you were advised that Mr. Holmes was not happy with how things were progressing?
>
> A. No. At the time I thought that presenting the facts to Mr. Tylutki was all that I needed to do.
>
> Q. Do you believe that that particular criticism had anything to do with your age?
>
> A. I believe it happened immediately after my leave.
>
> Q. Did you believe that the particular criticism had anything to do with your age?
>
> A. I believe it did. But I have no evidence of that. I cannot think—I cannot read my supervisors' minds. (Pl.'s Dep. 142:5–21.)
>
> Q. Do you believe or contend that your supervisor blamed you for the time frames not being met because of your age?
>
> A. I believe that.
>
> Q. What's the factual basis for that?

---

[7] Gonzalez argues that his termination was not the only adverse job action. The Court will address that contention, below.

A. I have no factual basis other than, you know, observation and intuition. (Pl.'s Dep. 145:9–15.)

Q. Did anyone at Carestream ever make any derogatory remarks regarding your age?

A. No. (Pl.'s Dep. 162:5–7.)

Gonzalez argues that the nexus between his termination and his age is established because he was replaced by an individual significantly younger than himself. Pl.'s Mem. of Law in Opposition to Def.'s Motion for Summary Judgment at 20, Mar. 24, 2015, ECF No. 39. "Mr. Gonzalez' duties were ultimately assumed for a significant period of time by Mr. Kopcienski who is significantly younger than Mr. Gonzalez." *Id.* 21. Gonzalez relies on Kopcienski's deposition testimony, where he was asked the following questions and gave the following answers:

Q. So after Mr. Gonzalez is terminated, who replaced him?

A. Nancy Baty. Actually, initially it was me acting in that position. And I don't remember how long it was until we got someone else on board.

Q. What was that person's name?

A. Nancy Baty.

Q. Do you know how old Ms. Baty is?

A. I do not.

Q. Do you know whether she is younger or older than you?

A. I think she's around the same age. I don't know for sure.

Q. Did she become the commercialization business manager?

A. Yes.

Q. So she assumed Mr. Gonzalez' exact position?

A. Yeah. I don't remember the timing. It might have been even as much as ten months later or so.

Kopcienski Dep. 84:5–25, Pl.'s Ex. D, Mar. 24, 2015, ECF No. 41-2. In 2014, Kopcienski was 51 years old, thus, approximately 14 years younger than Gonzalez. *Id.* 6:18–19.

[A]s the Supreme Court of the United States has clarified, the plaintiff must establish that he was treated less favorably than significantly younger em-

28

ployees. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L.Ed.2d 433 (1996) ("In the age-discrimination context, ... an inference [of discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger."); *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 78–79 (2nd Circ., 2005) (mere replacement of worker in protected class by worker outside of the class fails to establish prima facie case of discrimination absent evidence that worker was replaced by significantly younger worker). Moreover, courts have held that age differences of less than three years are "insignificant" for purposes of determining whether or not one employee is significantly younger or older than another employee. *See Jaworski v. Westplex Corp.,* 49 F. Supp. 2d 151, 159 (W.D.N.Y.1998) (Telesca, J.) (replacement of a 43 year old manager by 40–year employee who previously reported to the manager, "in absence of other evidence, does not give rise to an inference of discrimination" as "[t]he age differences are too insignificant for a reasonable trier of fact to conclude that the older employee was terminated because of his age."). *See also Munoz v. St. Mary–Corwin Hosp.,* 221 F.3d 1160, 1166 (10th Cir. 2000) (holding that two-year difference between plaintiff and replacement employee was "obviously insignificant" and therefore replacement of plaintiff with younger employee failed to establish an inference of discrimination); *Grosjean v. First Energy Corp.,* 349 F.3d 332 (6th Cir. 2003) (collecting 26 cases in which age differences of less than ten years between plaintiffs and replacement or comparative employees were held to be insufficient to establish an inference of discrimination).

*Heinrich v. Xerox Corp.*, No. 10–CV–6239T, slip. opn. 6–7, 2011 WL 2471477, 2, 2011 U.S. Dist. LEXIS 66433, 7–9 (W.D.N.Y. June 22, 2011). A difference of eight years is "not insignificant." *Tarshis v. Riese Organization*, 211 F.3d 30, 38 (2d Cir. 2000). "The fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). Thus, Gonzalez' meets the fourth requirement to show a *prima facie* case of age discrimination.

Carestream has proffered a non-discriminatory reason for Gonzalez' termination: his poor performance in 2008 and 2009, leading to a less than satisfactory rating, and a PIP. Now the burden shifts back to Gonzalez to prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action

and not just a contributing or motivating factor. Thus, the Court now addresses Gonzalez'

contention that his termination was not the only adverse employment action.

Gonzalez argues that while he and Carestream "agree that the termination of Mr.

Gonzalez is an adverse employment action, Gonzalez also suffered adverse employment

actions when he was provided with a poor performance review and then placed on a

performance improvement plan." Pl.'s Mem. of Law 14. Gonzalez cites three cases in

support of this argument: *Rowe v. New York State Div. of the Budget*, No. 1:11-CV-1150

(LEK/DRH), 2012 U.S. Dist. LEXIS 132238, *10 (N.D.N.Y. Sept. 17, 2012); *Vergara v.*

*Bentsen*, 868 F. Supp. 581, 592 (S.D.N.Y. 1994); and *Schaff v. Shalala*, No. 93 Civ. 1251,

1994 U.S. Dist. LEXIS 10556, *20 (D. Md. July 14, 1994). Carestream, on the other hand,

contends that Gonzalez' termination was the sole adverse employment action. Def.'s

Mem. of Law 4.

As the Honorable John T. Curtin of this Court observed in a 2006 decision which is

favorably quoted by the Northern District in *Rowe*:

> It is "settled law in this Circuit that the receipt of a counseling memo or no-
> tice of discipline does not constitute an adverse employment action."
> *Magilton v. Tocco*, 379 F. Supp. 2d 495, 507 (S.D.N.Y.2005) (citing *Weeks*,
> 273 F.3d at 86). Likewise, negative "[e]valuations are adverse employment
> actions only if they affect ultimate employment decisions such as promo-
> tions, wages or termination." *Johnson v. Connecticut Dep't. of Corr.*, 392 F.
> Supp. 2d 326, 340 (D. Conn. 2005) (quoting *Knight v. City of New York*, 303
> F. Supp. 2d 485, 497 (S.D.N.Y. 2004), aff'd, 147 Fed. Appx. 221 (2d Cir.
> 2005).; *see also Kazmierczak v. Hopevale*, 2006 U.S. Dist. LEXIS 36723
> (WDNY June 6, 2006) ("An unsatisfactory evaluation or counseling memo
> with respect to job performance is insufficient, without more, to constitute an
> adverse employment action.") (citing *Fairbrother v. Morrison*, 412 F.3d 39,
> 56-57 (2d Cir. 2005)).

*Hicks v. Baines*, 99-CV-315C(Sc), 2006 U.S. Dist. LEXIS 48002, 17-18 (W.D.N.Y. July

14, 2006), *overruled on other grounds*, 593 F.3d 159, 166–69 (2d Cir. 2010) (finding that

allegations of workplace sabotage and punitive scheduling were sufficient to survive summary judgment and show an adverse employment action for purposes of a retaliation claim). In Gonzalez' second cited case, *Vergara v. Bentsen*, 868 F. Supp. 581, 592 (S.D.N.Y. 1994) (citing *Schaff v. Shalala*, No. 93 Civ. 1251, 1994 U.S. Dist. LEXIS 10556, at *20 (D. Md. July 14, 1994), the district court observed that "giving an employee unjustifiably negative performance evaluations … may constitute adverse action providing a basis for a plaintiff's retaliation claim."

The third case Gonzalez cites, *Schaff v. Shalala*, No. Nos. HAR 93-1251, HAR 93-1993, 1994 U.S. Dist. LEXIS 10556 (D. Md. 1994), although a Title VII and Rehabilitation Act case, has pertinent language about the depth of review the Court should give to performance evaluations. In that case, the district court wrote:

> Although Schaff disputes the criteria underlying his evaluation, "[Title VII] is not intended as a vehicle for judicial review of business decisions. Nor does [Title VII] allow a court to sit as a super-personnel department." *Pfeifer v. Lever Bros. Co.*, 693 F. Supp. 358, 364 (D. Md. 1987), *aff'd without op.*, 850 F.2d 689 (4th Cir. 1988). It is the employer's prerogative, not the employee's to establish the relevant criteria and expectations for continued employment. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989) ("The employee doesn't get to write his own job description. An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age.")

*Schaff*, 1994 U.S. Dist. LEXIS 10556, 20.

One of Carestream's cited cases, *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749 (2d Cir. 2004), is factually distinguishable from the case at bar. In *Sanders*, the Second Circuit wrote:

> Plaintiff asserts that the adverse employment action in her case was the performance evaluation and its critical addendum. But she offered no proof that this evaluation had any effect on the terms and conditions of her employment. On the contrary, the negative evaluation remained in Sanders'

file for only two weeks before being destroyed, and her promotion to the rank of Supervisor II was ultimately changed from provisional to permanent. A jury could therefore reasonably find that the evaluation did not, on its own, constitute a materially adverse action by her employer.

*Sanders*, 361 F.3d at 756. Carestream's other cited case, *Brown v. Am. Golf Corp.*, 99 Fed. Appx. 341, 343 (2d Cir. 2004) ("Brown's claim that being placed on the Performance Improvement Plan constituted retaliation in violation of Title VII fails at the prima facie stage because being placed on the Performance Improvement Plan was not an adverse employment action."), does support its contention that simply placing Gonzalez on the PIP did not constitute an adverse employment action.

The Court concludes that the 2009 negative performance evaluation, and the PIP, constitute adverse employment actions. In addition to being part of a progressive disciplinary process, the negative evaluation made Gonzalez ineligible for a discretionary bonus in 2010.[8] Further, the 2009 performance evaluation of "(3) Less than Successful Performance," Pl.'s Ex. E, led to Gonzalez' placement on the PIP, and his failure to conform to the requirements of the PIP led to his termination. Nevertheless, nothing presented on this motion leads to the conclusion that the poor evaluation and PIP were simply a mask for discrimination based solely on Gonzalez' age.

Carestream's proffered non-discriminatory reason for issuing an unsatisfactory performance evaluation for 2009, placing Gonzalez on the PIP, and ultimately terminating him, are all related to their contention that he was a poor performer. Gonzalez disputes that Carestream correctly evaluated his performance. However, that issue does not raise a material question of fact precluding summary judgment. As the Honorable David G. Larimer of this Court noted in *Heaphy v. Webster Central Sch. Dist.*, 761 F. Supp. 2d 89

---

[8] Bonuses had been announced on February 26, 2010. Gonzalez Dep. 146:10–13.

(W.D.N.Y. 2011):

> Nor is Heaphy's disagreement with the District's assessment of her performance sufficient to raise a question of fact as to whether the evaluations were motivated by discriminatory animus. As this Court has previously observed, "[w]hat matters is why [a school district] did what it did, not whether it was wise to do so. Title VII prohibits discrimination, not poor judgment." *Seils v. Rochester City School District,* 192 F.Supp.2d 100, 111 (W.D.N.Y.2002), *citing, inter alia, Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process"). Thus, even if the District's performance evaluations or decision to place Heaphy on a performance improvement plan were misguided, ill-founded, or unnecessary, they do not violate Title VII in the absence of evidence of a discriminatory motive. *See Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 290 (S.D.N.Y.1999) (Sotomayor, C.J.) ("[a]bsent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not based on a discriminatory reason"). Plaintiff has produced no evidence that such a motive was present here, or that she was treated any differently from other teachers.

*Heaphy*, 761 F. Supp. 2d at 94. Thus, the Court need not assess the wisdom of Carestream's evaluations of Gonzalez in determining whether summary judgment is appropriate.

Gonzalez' supervisor stepped into Gonzalez' position after Gonzalez' termination, and ultimately a woman significantly younger than Gonzalez replaced him. The problem is that even though he was replaced by persons 15 or more years younger, Gonzalez has produced no other evidence that the adverse employment actions would not have occurred but for his age.

> A court's perception that an employer misjudged an employee's qualifications might be probative in some cases on the issue of pretext. *Burdine,* 450 U.S. at 259, 101 S. Ct. at 1097. The distinction lies between a poor business decision and a reason manufactured to avoid liability. Thus, facts may exist from which a reasonable jury could conclude that the employer's "business decision" was so lacking in merit as to call into question its genuineness. *See Sparks,* 830 F.2d at 1564 ("implausibility" of alleged reason sufficient to create genuine issue of material fact); *Sorba v. Pennsylvania Drilling Co.,*

> 821 F.2d 200, 205 (3d Cir.1987) (reversing entry of summary judgment
> because of "inconsistencies and implausibilities in employer's proffered
> reasons for discharge...."), *cert. denied,* 484 U.S. 1019, 108 S. Ct. 730, 98
> L.Ed.2d 679 (1988)....

*Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988). Gonzalez' arguments on

both the ADEA and FMLA claims essentially are that the poor performance evaluation

and PIP were "manufactured to avoid liability." Justice O'Connor, writing for a unanimous

court in an ADEA discrimination case, stated: "[A]lthough the presumption of discrimina-

tion 'drops out of the picture' once the defendant meets its burden of production, *St.*

*Mary's Honor Center, supra,* at 511, 113 S. Ct. 2742, the trier of fact may still consider the

evidence establishing the plaintiff's prima facie case 'and inferences properly drawn

therefrom ... on the issue of whether the defendant's explanation is pretextual,' *Burdine,*

*supra,* at 255, n. 10, 101 S. Ct. 1089." *Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000). The Court notes the

proximity of Gonzalez' allegedly poor performance and the FMLA leave, as well as

Gonzalez' replacement by significantly younger individuals. However, the proof fails to

show that age was the "but for" cause of Gonzalez' placement on the PIP, or eventual

termination. Consequently, his ADEA claim fails.

### FMLA Retaliation

Under the FMLA, when requesting leave the employee need not specifically

mention the Act, as detailed in the pertinent parts of the following regulation:

> (c) Content of notice. An employee shall provide at least verbal notice suf-
> ficient to make the employer aware that the employee needs
> FMLA-qualifying leave, and the anticipated timing and duration of the leave.
> Depending on the situation, such information may include that a condition
> renders the employee unable to perform the functions of the job…. When
> an employee seeks leave for the first time for a FMLA-qualifying reason, the
> employee need not expressly assert rights under the FMLA or even men-

34

tion the FMLA. When an employee seeks leave due to a FMLA-qualifying reason, for which the employer has previously provided FMLA-protected leave, the employee must specifically reference the qualifying reason for leave or the need for FMLA leave. In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave. *See* § 825.305…. An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying.

29 CFR 825.302(c) (2013). Therefore, the Court rejects Carestream's argument that Gonzalez was not on FMLA-qualifying leave in September and October 2009. He had provided his employer with sufficient information under the regulation quoted above, to qualify for FMLA leave. Further, the fact that Carestream did not provide Gonzalez with any forms to request FMLA leave is insignificant.

Gonzalez' sole FMLA claim is that Carestream retaliated against him for taking FMLA-qualifying leave, and the facts, viewed in the light most favorable to Gonzalez, are sufficient to meet the low threshold to show a *prima facie* case of retaliation. Carestream's proffered non-discriminatory reason for taking adverse employment actions is that Gonzalez' poor performance made him unqualified for his position and resulted ultimately in his termination. The Court has already rejected Carestream's "unqualified for his position" argument based on Carestream's allegations that he performed poorly. The Court will now examine Carestream's proffered evidence on Gonzalez' performance to ascertain whether any material factual issues preclude summary judgment.

Gonzalez was out of work on FMLA-qualified leave from September 21, 2009,

through October 16, 2009, a period of twenty-five days. He alleges that "[i]mmediately upon his return to work, [he] was subjected to retaliation for having exercised his rights under the FMLA." Compl. ¶ 15. Gonzalez was deposed on this point and responded to the following questions with the following answers:

> Q. Do you believe that that particular criticism had anything to do with your age?
>
> A. I believe it happened immediately after my leave.
>
> Q. Did you believe that the particular criticism had anything to do with your age?
>
> A. I believe it did. But I have no evidence of that I cannot think—I cannot read my supervisors' minds.
>
> Q. What's the factual basis for your belief that it did?
>
> A. The only thing I can think—excuse me for a moment There's a Bob Dylan song with a line that says, "You don't need a weatherman to tell which way the wind blows." So no. I do not have factual—factual examples to give you.
>
> Q. You do not?
>
> A. Correct.
>
> Q. Do you have any reason to believe it was related to your medical leave?
>
> A. Other than the fact that I detected a significant change and behavior toward me right after my return, no. There is nothing else.
>
> Q. What significant change in behavior did you detect?
>
> A. I detected an increased—heavily increased negativity toward me.
>
> Q. How so?
>
> A. Because of all these conversations and documents we've been dis-cussing.
>
> Q. So directly after you returned from your medical leave, the criticisms that you received were from Mr. Tylutki, correct?
>
> A. Yes.
>
> Q. But do you believe it had nothing to do—or do you believe it had anything to do with your medical leave itself?
>
> A. I believe so.
>
> Q. What's the factual basis for that?
>
> A. I don't have factual basis on that.

Pl.'s Dep. 142:13–144:5. "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). "Heavily increased negativity" is a conclusory statement and does not show a nexus between Gonzalez' absence on FMLA-qualifying leave and the adverse employment actions.

In his memorandum of law, Gonzalez points out that his poor performance rating related to delays encountered in the *RadSuite* project that occurred while Gonzalez was out on leave. Pl.'s Mem. of Law at 6. Tylutki related to Gonzalez that his boss, Holmes, "was upset that a few items had been completed in Mr. Gonzalez' absence." *Id.* at 5. Gonzalez showed Tylutki an email he had sent to his replacement, Whitfield, where Gonzalez specifically asked Whitfield, as the interim CBM, to complete the tasks. Gonzalez points out that the Gate 2 date missed by only two weeks, and his team made their Gate 3 date as per their commitment.

The other performance problems noted concerned the *Cardinal* and *Crystal* projects. The delay for the *Cardinal* project occurred in 2008 and was noted in that evaluation, for which Gonzalez received a "2" grade. In the Supervisor Assessment column for the *Cardinal* project Gate 3D (item 1.1 on the appraisal form), is the following language:

> [Gonzalez] has done an acceptable job managing the problems as they arise but we continue to have issues arise late in the game. Need to improve on risk analysis early in program to make sure we identify all risks and mitigate risks earlier thereby creating more predictable performance.

Def.'s Ex. J at 1, Goal Setting and Appraisal, Jan. 1, 2008, to Dec. 31, 2008, Feb. 9, 2015, ECF No. 35-5. The same comment appears for item 1.2 on the appraisal, and in item 1.4 *Crystal* Gate 0, Tylutki wrote "will be looking for [Gonzalez] to focus on schedule risk / compression opportunities. Also looking for [him] to set interim milestones and build

success with the team at consistently hitting these milestones." Ex. J at 3. At item 1.5,

"Drive commercialization improvements," Tylutki wrote, "Complement [Gonzalez] on the

work done to change the behavior of the team with respect to improved use of project

schedules, risk + analysis, commitment on deliverables. For the screen programs a crit-

ical success factor will be how well [he] is able to do this going forward." Ex. J at 3. As the

Court outlined above, in the narrative portion of Gonzalez' 2008 evaluation, Tylutki wrote:

> For 2009 [Gonzalez] needs to work with his commercialization teams on improving schedule performance. [He] needs to help the commercialization team do a better job with risk assessment, contingency plans, and keeping focus on the critical items which will deliver the program. Additionally I would like [him] to continue to work on knowing when detail is needed and when it is not. One of the detriments of being very detail oriented is at certain stages of the program this can result in wasted effort. Making sure early on in programs that the team has the big picture and understands where they are relative to the overall goal is important to keep them from getting lost in the details and heading down paths which will not create success or will result in delays.

Ex. J at CH0019.

In Gonzalez' 2009 performance appraisal, Tylutki noted that Gonzalez failed to

meet Goal 3 of the *Cardinal* project, which was to "Complete Post-Release Assessment

(May)." Ex. K at 1. Tylutki noted that the "[p]ost release assessment [was] completed in

Q4 vs Q2 plan." *Id.* Writing about Gonzalez' *Crystal* project, Tylutki noted the same issues

with regard to not meeting his commitments ("did not meet Gate 1 Commitment on this

program") and not mitigating risk for that project ("[t]he business risk in France continues

to grow") as he had previously noted on Gonzalez' work for the *Cardinal* project. How-

ever, as Gonzalez points out, the delay of the post-release assessment for the *Cardinal*

project was due to Gonzalez' inability to obtain performance data on the project, and

Gonzalez' decision to give priority to the *RadSuite* project. Tylutki acknowledged that the

post-release assessment delay created "no direct impact to business…." Ex. E at 1.

Late in the third quarter, Tylutki transferred responsibility for the *Crystal* project to another individual in order to increase Gonzalez' "schedule predictability on Radsuite." Ex. K at 4. For the *RadSuite* project, Gonzalez' team did not meet its Gate 0 goal of April 16, 2009, until June 18, 2009. *Id.* Tylutki noted in the second quarter that "[t]he team continues to be challenged with the distraction of the MX option which is adding risk to the program schedule." *Id.* at 5. Gonzalez points out that *Crystal* was not a commercialization project, thus was of higher risk, and was ultimately delayed due to technical issues about which he could do nothing. Pl.'s Dep. 52:9–22; 55:12–19. Tylutki, when deposed on this project's technical delays, said: "It's the responsibility of the technical program manager. But it's the responsibility of the commercialization manager to ultimately be assessing that risk, assessing what needs to be done, applying resources to try to mitigate that risk, working with the TPM." Tylutki Dep. 78:10–15. The TPM for the *Crystal* project was Alice Moon ("Moon"). *Id.* 78:16–18. After Tylutki transferred total responsibility for the *Crystal* project to Moon, he recalled "the predictability improved. That's my general recollection." *Id.* 79:9–13.

Gonzalez' team met its Gate 1 goal on *RadSuite* on September 17, 2009, *id.*, but missed its Gate 2 goal of January 14, 2010, by 14 days. *Id.* at 6. On April 30, 2010, Gonzalez was placed on the PIP, which was six months after his return from FMLA leave. Ex. N at 1, Def.'s App'x to L.R. 56 Statement of Undisputed Facts, Feb. 9, 2015, ECF No. 36-5. The time between Gonzalez' return from FMLA leave on October 16, 2009, until his termination on June 30, 2010, was eight months and two weeks, or 257 days. As the district court observed in *McDowell v. N. Shore‑Long Island Jewish Health Sys.*, 788 F.

Supp. 2d 78 (E.D.N.Y. 2011):

> The Second Circuit has not established a bright line rule as to how closely an adverse employment action must follow protected activity to imply that the former was in retaliation for the latter. *See, e.g., Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Gorman‑Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001)). While some courts within this Circuit have held that a three month gap is insufficient to show a causal connection, others have found that a separation of as much as eight months will permit an inference of causation. *Id.* (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) and *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980)).

*Id.* at 82. Gonzalez relies heavily on the inferences of age discrimination and FMLA retaliation he draws from these facts: (1) that Moon was not placed on a PIP for the delays in the *Crystal* project; (2) that Holmes' complaints about items in *RadSuite* not being complete were the responsibility of the interim CBM chosen by Tylutki and occurred while Gonzalez was on FMLA leave; (3) that Tylutki never discussed with him Gonzalez' rebuttal statements regarding his 2009 performance evaluation; (4) that the basis for his poor performance grade on the 2009 evaluation concerned issues related to *RadSuite* that took place while Gonzalez was on FMLA leave; (5) that despite Carestream's PIP policy, Tylutki met with Gonzalez only once during the PIP period to review Gonzalez' progress (the second meeting was Gonzalez' termination meeting); and (6) that on April 29, 2010, when *RadSuite* successfully passed Gate 3, Holmes sent an email to the entire team, except Gonzalez, congratulating the team on their hard work (Pl.'s Dep. 148:5–22).

Here, the Court determines that the six month period between Gonzalez' return from FLMA leave and being placed on a PIP, as well as the eight month period between his return and his termination, are too attenuated to allow for the conclusion that his termination was in retaliation for the FMLA leave period. Though the adverse comments

occurred close in time to his termination, the performance appraisals and PIP do not support Gonzalez's conclusion that the comments he alleges his supervisor made were indicative of a retaliatory intent. As the Court suggested in its prior decision on Defendant's motion to dismiss, Gonzalez' "reliance on temporal proximity does not lend plausibility to his claim that his termination was due to retaliation." Decision and Order at 14, Sept. 19, 2012, ECF No. 10. Now following full discovery and using unredacted[9] copies of Gonzalez' performance reviews, the Court concludes that Gonzalez has failed to show that either his placement on a PIP in April 2010, or his termination on June 30, 2010, was in retaliation for his twenty-five-day FMLA leave. Therefore, Carestream is entitled to judgment on Gonzalez' FMLA cause of action.

## CONCLUSION

For the reasons stated above, the Court grants Carestream's motion for summary judgment, ECF No. 36. The Clerk is directed to enter judgment for Carestream and close this case.

IT IS SO ORDERED.

Dated:  May 6, 2016
        Rochester, New York

                    ENTER:

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge

---

[9]  The Court of Appeals concluded it was error for this Court to base its decision to dismiss the complaint on the "highly redacted and incomplete performance evaluations submitted by Carestream in its responsive papers." *Gonzalez v. Carestream*, No. 12-402-cv (2d Cir. Apr. 2, 2013), slip. opn. at 3.